Elizabeth V. McNulty (Bar No. 192455)
emcnulty@archernorris.com
Patrick R. Ball (Bar No. 249844)
pball@archernorris.com
ARCHER NORRIS
4695 MacArthur Court, Suite 350
Newport Beach, CA 92660-8816
Telephone: 949.975.8200
Facsimile: 949.975.8210

Attorneys for Defendant
TASER International, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY SCHROCK, individually and as the personal representative for THOMAS H. SCHROCK, deceased, MATTHEW SCHROCK and SARAH PALMER,<br><br>Plaintiffs,<br><br>v.<br><br>TASER INTERNATIONAL, INC.; PATRICK "RICK" SMITH; LEXIPOL, LLC, and DOES 1-100, inclusive,<br><br>Defendants. | Case No.<br><br>**DECLARATION OF ELIZABETH V. MCNULTY IN SUPPORT OF NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441(b) (DIVERSITY)**<br><br>San Bernardino Superior Court Case No. CIVDS1408556 |

I, Elizabeth V. McNulty, do hereby declare:

1.      I am an attorney admitted to practice before all of the Courts in the State of California, including the United States District Court, Central District of California, and am a partner with the law firm of Archer Norris. I am counsel of record for defendant, TASER International, Inc. ("TASER"), on whose behalf I submit this declaration in support of TASER's Notice of Removal.

2.      If called as a witness, I would competently testify to the following facts, all of which are within my own personal knowledge. I have reviewed the file and am sufficiently familiar with the documents therein.

3.     On June 17, 2014, an action was commenced in the San Bernardino County Superior Court of the State of California, entitled *Nancy Schrock, individually and as personal representative for Thomas H. Schrock, deceased; Matthew Schrock; and Sarah Palmer vs. TASER; Patrick "Rick" Smith ("Smith"); Lexipol, LLC ("Lexipol"); and Does 1-100, inclusive*, as case number CI9VDS1408556.  A true and copy of the complaint filed by Plaintiffs is attached hereto as Exhibit A.

4.     A Proof of Service of Summons filed in the San Bernardino County Superior Court on September 25, 2014 indicates that Plaintiffs served a copy of the complaint on TASER on September 19, 2014.  A true and correct copy of the Proof of Service on TASER filed by Plaintiff s, which I obtained from the San Bernardino County Superior Court website, is attached hereto as Exhibit B.

5.     More than $75,000 is clearly at issue in this lawsuit.   Although Plaintiffs' Complaint fails to allege a specific amount, it seeks to recover economic and non-economic damages against Defendants for the wrongful death of Thomas H. Schrock, as well as punitive and exemplary damages against Defendants.  *See* Complaint, Exhibit A attached hereto.

6.     Based upon the allegations in the Complaint Plaintiffs Nancy Schrock, Matthew Schrock and Sarah Palmer are all citizens of the State of California.  *See* ¶ 41 of Complaint, Exhibit A.  TASER is a Delaware corporation with its principal place of business in Scottsdale, Arizona.  *See* ¶¶ 1 and 2 of the Complaint, Exhibit A.  Defendant Smith is a citizen of Arizona and is the Chief Executive Officer of TASER.  *See* ¶ 2 of the Complaint, Exhibit A.   Defendant Lexipol is a Delaware Corporation with its principal place of business in Aliso Viejo, California.  *See* ¶ 3 of the Complaint, Exhibit A.  While Lexipol is a resident of the state of California based upon its principal place of business being located in California, its citizenship should not be considered for purposes of determining that federal jurisdiction

//

exists, as Lexipol was fraudulently joined in this action for the purpose of defeating diversity. *See* TASER's Notice of Removal, filed concurrently herewith.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and that this declaration was executed the 17th day of October, 2014, in Newport Beach, California.

Elizabeth V. McNulty

DECLARATION OF ELIZABETH V. MCNULTY
IN SUPPORT OF NOTICE OF REMOVAL

EXHIBIT A

1  Garo Mardirossian, Esq., #101812
   Rowena J. Dizon, Esq., #171365
2  MARDIROSSIAN & ASSOCIATES, INC.
   A Professional Law Corporation
3  6311 Wilshire Boulevard
   Los Angeles, CA  90048-5001
4  Telephone (323) 653-6311
   Facsimile (323) 651-5511
5
   John Burton, State Bar No. 86029
6  THE LAW OFFICES OF JOHN BURTON
   4 East Holly Street, Suite 201
7  Pasadena, California 91103
   Tel: (626) 449-8300/Fax: (626) 449-4417
8
   Attorneys for Plaintiffs Nancy Schrock, Matthew Schrock
9  and Sarah Palmer

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

JUN 1 7 2014

BY ___*Sugey Quintero*___
SUGEY QUINTERO, DEPUTY

10

11          SUPERIOR COURT OF THE STATE OF CALIFORNIA

12              FOR THE COUNTY OF SAN BERNARDINO

13

| | |
|---|---|
| 14  NANCY SCHROCK, individually and as the personal representative for THOMAS H. SCHROCK, deceased, MATTHEW SCHROCK and SARAH PALMER, | Case No.:   CIVDS1408556 |
| 15 | **COMPLAINT FOR DAMAGES FOR DEATH AND WRONGFUL DEATH BASED ON:** |
| 16 | |
| 17          Plaintiffs, | 1.   **NEGLIGENCE** |
| 18          v. | 2.   **STRICT PRODUCTS LIABILITY** |
| 19  TASER INTERNATIONAL, INC.; PATRICK "RICK" SMITH; LEXIPOL, LLC., and DOES 1-100, inclusive, | 3.   **INTENTIONAL MISREPRESENTATION** |
| 20 | |
| 21          Defendants. | 4.   **NEGLIGENT MISREPRESENTATION** |
| 22 | 5.   **FRAUDULENT CONCEALMENT AND DECEIT** |
| 23 | |
| 24 | **DEMAND FOR JURY TRIAL** |
| 25 | |
| 26 | [Amount demanded exceeds $25,000] |
| 27 | |
| 28 | |

-1-
COMPLAINT FOR DAMAGES

**PARTIES**

1.    The Decedent is Thomas H. Schrock (also hereinafter referred to as "Tom"). Plaintiff Nancy Schrock is a competent adult and Decedent's spouse. She appears individually and as the personal representative for Thomas H. Schrock, deceased. She files with this complaint a declaration pursuant to Cal. Civ. Code § 377.32. Plaintiffs Matthew Schrock and Sarah Palmer are the adult children of Tom and Nancy. Both are competent to bring suit.

1.    Defendant TASER International, Inc., ("TASER") is a Delaware Corporation with its principal place of business in Scottsdale, Arizona. Defendant TASER is engaged in the business of designing, manufacturing, fabricating, marketing, distributing and selling hand-held electrical weapons (sometimes referred to as "stun guns," "tasers," "ECDs," "NMIs," "ESWs," or "CEWs", among other things), including the Model X26, to law enforcement and corrections agencies, among other customers, throughout the United States and Canada. TASER designs, manufactures, fabricates, markets, distributes and sells replacement cartridges for ongoing use of the Model X26 by those law enforcement agencies and their officers. As a key part of its marketing strategy, TASER designs, manufactures, fabricates, distributes, and administers a purportedly comprehensive training program for its customer agencies, which is relied upon by customer agencies. TASER manufactured the Model X26 which killed Tom Schrock, and is directly responsible for the training program used to train the Ontario Police Department (OPD) officer who fired it. TASER is qualified to do business in California.

2.    Defendant Patrick "Rick" Smith is a citizen of Arizona. He is the CEO of Defendant TASER. Rick Smith is personally liable as alleged herein, despite the fact that he was acting on behalf of TASER, because he was the "guiding spirit," the "central figure," and the "active directing hand in charge" in regards to the wrongful conduct alleged below.

3.    Defendant Lexipol, LLC, is a Delaware Corporation with its principal place of business in Aliso Viejo, California. Lexipol advises police departments, including the OPD, on policies and practices, such as those relating to the proper use of TASER products. Departments, such as the OPD, rely on Lexipol for policy and practice recommendations that minimize exposure to liability, which includes minimizing inadvertent injuries to people with whom

1 │ police officers come into contact.

2 │     4.    The true names of defendants Does 1 through 100 are presently unknown to

3 │ Plaintiff, who therefore sues each of these defendants by such fictitious name; but upon

4 │ ascertaining the true identity of a defendant Doe, Plaintiffs will amend this First Amended

5 │ Complaint or seek leave to do so by inserting the true name in lieu of the fictitious name.

6 │ Plaintiffs are informed and believe, and on the basis of such information and belief allege, that

7 │ each defendant Doe herein is in some manner responsible for the injuries and damages herein

8 │ alleged.

9 │ **FACTS RELEVANT TO THE TASER MODEL X26**

10 │     5.    "Tasers" were invented in the mid-1970s by an electrical engineer, Jack Cover, as

11 │ a use-of-force option for police and correctional officers. Tasers are hand-held weapons that fire

12 │ two darts, one above the other, connected to wires leading to a cartridge attached to the front of

13 │ the device. Pulling the trigger fires both darts and discharges pulses of electrical current that

14 │ radiate through tissue between the darts. The pulses are intended to cause skeletal muscle

15 │ contractions that temporarily disable the person shot by the device. Some, including the X26

16 │ used in this case, have video cameras (with audio) known as "TASER-cams," activated by

17 │ disengaging the safety.

18 │     6.    When the electrodes on the front of the device are exposed – either through

19 │ removing the cartridge or by firing it – a person can be shocked by pressing the electrodes into

20 │ the flesh. TASER refers to this barbaric use of its product by the euphemism: "drive stun."

21 │ When a drive stun is used while the cartridge remains in place and one or more darts are

22 │ embedded in a person, the electricity can travel between a dart and an electrode, which TASER

23 │ refers to as a "three-point" drive stun. Tom Schrock was killed by a three-point drive stun over

24 │ his heart.

25 │     7.    In the early 1990s, Rick Smith and his brother Tom Smith founded the company

26 │ that later became TASER International, Inc. They acquired from Cover the trademark "TASER"

27 │ – an acronym created out of the title of the children's book "Tom Swift's Electric Rifle" – along

28 │ with various patents and licenses.

8. During the 1990s, Rick Smith discovered that tasers were not popular with law enforcement because they did not have sufficient stopping power. To boost sales to law enforcement and corrections agencies, and to dominate the then competitive market in tasers, Rick Smith increased the electrical output by a factor of four, and released the "Advanced TASER Model M26" in late 1999.

9. Rick Smith and TASER represented to their law enforcement agency customers and potential customers, and to the end users of their products, that the electrical current of the M26 was within established safety margins, and that extensive animal and human testing had demonstrated that the current cannot affect heart rhythms. These claims were false. There were no applicable safety standards, the animal testing was minimal, at best, and there was no scientific testing on human beings.

10. In 2003, TASER began selling a lighter weight, yet equally powerful, electrical weapon, the Model X26. To accommodate customer preferences for a smaller weapon without diminishing its stopping power, TASER increased the pulse duration for the X26 far beyond that of any previous "taser." This longer pulse increased the propensity of the X26 to "capture" cardiac rhythms when current flowed near the heart, and therefore increased the risk of disrupting normal heart rhythms by inducing arrhythmias such as ventricular fibrillation, which results in cardiac arrest and is lethal unless promptly reversed with defibrillation shocks.

11. The X26, like the M26 before it, has a laser sight that projects a dot as the aim-point for the top dart. The X26 is designed to pulse 19 times per second for five seconds. Exposures can be prolonged by holding the trigger, repeated by pulling the trigger again while the darts remain in the target, and terminated early by engaging the safety. The time and duration of each discharge is recorded on a computer chip called the "dataport" mounted inside each X26

-4-

COMPLAINT FOR DAMAGES

12.     TASER did not properly test or evaluate the risk of cardiac arrest from the X26 before putting it on the market. TASER sold the device to law enforcement and corrections agencies with representations (many based on M26 testing) such as "TASER tests have found no effect on heart rhythms" when "tested on animals," (Version 10 Command Demo, Slide 24), and "heart rate unchanged during TASER X26 stimulation directly through chest, across the heart," (Version 10 Command Demo, Slide 26). TASER knew the science was inadequate to support such claims.

13.     TASER sells various accessories, including replacement cartridges, for the X26. One option for customer agencies is "extra-penetration" or "XP" darts. These can penetrate one-half inch or more into a human being. These increase cardiac risk. To increase its revenues from the sale of replacement cartridges, TASER encourages X26 use through its "training program."

14.     From 2003 to the present, TASER has sold the Model X26 to law enforcement agencies such as the Ontario Police Department (OPD), either directly or through distributors, with directions that the agencies train officers pursuant to TASER training. Under the direct supervision of Rick Smith and other high-level TASER executives, such as "Vice President for Training" Rick Guilbaut, TASER employs "senior master instructors" to train and certify "master instructors," generally off-duty officers looking to supplement their incomes. TASER contracts with these TASER-trained master instructors to hold "schools" where they train and TASER-certify training officers from customer agencies as "certified instructors," who, in turn, train and TASER-certify individual officers in the various agencies to use the X26.

15.     For use throughout the training process, TASER issues "training versions," revised about every year or two, which consist of "command demonstration," "instructor" and "user" PowerPoints featuring slides and videos, along with forms, tests, lesson plans, warnings, and other documents. TASER frequently issues "training bulletins" covering various issues, along with updated product warnings and operating manuals. TASER directs master instructors and certified instructors to check the TASER.COM website within 72 hours of each class to insure that the latest training materials are used at instructor and user training sessions. It is through this training protocol that TASER conveys instructions for use and warnings to customer

1   agencies and their users. Customer agencies such as the OPD and its trainers and officers, rely
2   on TASER to provide accurate, up to date information on the safe use of the X26 through its
3   training program.

4       16.    As the use of the X26 has increased, there have been a growing number of cardiac
5   arrests associated with discharges near the heart where the time course and the lack of a credible
6   alternative explanation for the cardiac arrest at that moment demonstrate that the direct effect of
7   the X26 current on the heart was the triggering cause for the cardiac arrest. One such report was
8   published in the prestigious *New England Journal of Medicine* on September 1, 2005.

9       17.    Against this backdrop, researchers began performing higher quality animal
10  experiments to measure the cardiac safety of the X26. In 2005, TASER arranged with one of the
11  nation's leading electrophysiologists (a board-certified cardiologist who is also board-certified
12  in the subspeciality of electrophysiology, the study of the heart's electrical rhythm), Patrick J.
13  Tchou, M.D., of the Cleveland Medical Clinic, and his fellow, Dhanunjaya Lakkireddy, M.D., to
14  design and perform animal testing. TASER approved and funded the testing, which it thought
15  would establish that people with cocaine were less likely to suffer cardiac arrest than those
16  without. Darts were placed in various positions on anesthetized pigs and five-second shocks
17  were delivered using a Model X26 and a custom device modified to deliver increased charges.
18  The study for the first time revealed that standard X26 current can "capture" cardiac rhythm, and
19  documented the close relationship between electrical capture of cardiac rhythm and the location
20  of the darts on the chest, establishing that only darts to the chest are likely to cause capture, a
21  potential trigger of cardiac arrest. Dr. Tchou told TASER representatives, including Rick Smith,
22  that his data established that avoidance of darts to the chest would reduce the risk of cardiac
23  arrest.

24      18.    These results were peer-reviewed and published in "Effects of Cocaine
25  Intoxication on the Threshold for Stun Gun Induction of Ventricular Fibrillation," *Journal of*
26  *American College of Cardiology*, Vol. 48, No. 4, 8/15/2006: 805-11, and in "Cardiac Effects of
27  Electrical Stun Guns: Does Position of Barbs Contact Make a Difference?", *Pacing Clin.*
28  *Electrophysiol.*, Vol. 31, 4/2008: 398-408.

19.     The authors wrote in 2006 that their "study is the first to describe capture of ventricular myocardium during application of [ECD] pulses." The authors state the following in their discussion:

Extending animal data to human beings should always be done with caution. However, pigs frequently have been used in fibrillation and defibrillation threshold studies with the results generalized to humans. The results of our study and the few prior animal studies would suggest that NMI discharge at the standard 5-s application is unlikely to cause life-threatening arrhythmias, at least in the normal heart. Our data regarding myocardial capture, however, suggest the potential for induction of ventricular tachycardia in subjects with substrate for ventricular tachycardia, especially if one of the electrodes were to come within a few centimeters of the myocardium, with the other positioned to direct the current toward the heart. In humans, the anterior apical right ventricular myocardium is closest to the chest wall. Positioning of an electrode in a small, thin human in the region of the left nipple with the other electrode near the sternal notch may simulate our Position A and could potentially achieve comparable proximities of electrodes to the heart. Avoidance of this position would greatly reduce any concern for induction of ventricular arrhythmias.

"Effects of Cocaine Intoxication on the Threshold for Stun Gun Induction of Ventricular Fibrillation," pp. 809-810.

20.     In their second report – based on the same data – the authors documented that the spread between the darts (a function of the distance from which the Model X26 is fired) substantially affected the cardiac risk, noting that a 15 centimeter spread – close range – has the greatest effect on cardiac rhythm. The second study concluded, among other things that:

Assuming that ventricular tachycardia could be induced in susceptible humans with the appropriate cardiac disease substrate, our data would suggest that directing the barbs away from the PMI region and especially toward the back would markedly increase the safety margins.

1    "Cardiac Effects of Electrical Stun Guns: Does Position of Barbs Contact Make a Difference?"
2    p. 408.

3         21.    At about the same time as the Tchou-Lakkireddy study, a peer-reviewed study by
4    Kumaraswamy Nanthakumar, MD and others, "Cardiac Electrophysiological Consequences of
5    Neuromuscular Incapacitating Device Discharges," *Journal of the American College of*
6    *Cardiology*, Vol. 48, No. 4, 8/15/2006: 798-804 (the "Nanthakumar Study"), became available
7    to TASER. This study confirmed the Tchou-Lakkireddy findings, and also showed that the X26
8    has an extremely high rate of causing myocardial stimulation when the electrodes are vectored
9    across the heart, much higher than the shorter pulsed M26.

10        22.    During 2007 and 2008, a second group of independent researchers, headed by
11   Andrew J. Dennis, D.O., and based at Stroger Hospital of Cook County in Chicago, replicated
12   the Tchou-Lakkireddy-Nanthakumar results, documenting ventricular arrhythmias and cardiac
13   arrests from X26 exposures to the chest. The results of these well constructed experiments were
14   published in three separate peer-reviewed studies: (1) "Acute Effects of TASER X26 Discharges
15   in a Swine Model," *Journal of Trauma*, Vol. 63, No. 3, 9/2007: 581-590, (2) "TASER X26
16   Discharges in Swine Produce Potentially Fatal Ventricular Arrhythmias," *Academy of*
17   *Emergency Medicine*, Vol. 15, No. 1, 1/2008: 66-73), and (3) "Taser X26 Discharges in Swine:
18   Ventricular Rhythm Capture is Dependent on Discharge Vector," *Journal of Trauma*, Vol. 65,
19   No. 6, 12/2008: 1478-1487 (the "Dennis Studies"). They provided powerful confirmation that
20   TASER discharges to the chest increase the risk of cardiac arrest.

21        23.    Another 2007 peer-reviewed article by Michael Cao, M.D., Jerold S. Shinbane,
22   M.D., Jeffrey M. Gillberg, M.S., and Leslie A. Saxon, M.D., "Taser-Induced Rapid Ventricular
23   Myocardial Capture Demonstrated by Pacemaker Intracardiac Electrograms," *Journal of*
24   *Cardiovascular Electrophysiology*, Vol. 18, No. 8, 8/2007: 876-879 (the "Cao Report"),
25   documented cardiac capture for the first time in a human being, a California state prison inmate
26   with a pacemaker who was shocked in the chest with an X-26.

27        24.    Although TASER commissioned the Tchou-Lakkireddy Study, and TASER knew
28   that the Nanthakumar Study, the Dennis Studies and the Cao case report were peer-reviewed and

1    scientifically sound, TASER maliciously, deliberately, wantonly and negligently failed to

2    modify its training. Continuing until September 30, 2009, TASER instructed the law

3    enforcement community to "aim like a firearm at center mass" and used illustrations in its

4    training materials depicting law enforcement officers shooting persons directly in the chest with

5    darts, where the risk of inducing ventricular arrhythmia is significantly greater than other areas

6    of the body.

7         25.    The reason that Rick Smith and TASER stubbornly refused to instruct differently

8    relates to sales. Police officers for whom the X26 was designed are trained extensively on the

9    proper use of firearms. To maximize their efficacy as a defensive weapon, firearms are aimed at

10   center mass. Officers have this procedure drilled into their "muscle memory." Marketing the

11   X26 both with directions that it must be aimed differently than a firearm, and with warnings that

12   firing into the chest of a human being increases the risk of cardiac arrest would have impacted

13   the cost/benefit analysis made by potential customer agencies contemplating the deployment of

14   tasers. Officers would need extensive training to modify "muscle memory" to distinguish

15   between aiming firearms and aiming X26s. Moreover, firing an X26 into a person's chest and

16   inadvertently triggering a cardiac arrest, after being warned not to do so, would result in

17   exposure to liability.

18        26.    The evidence of chest-shot risk, however, mounted until it became undeniable – to

19   everyone other than TASER and its acolytes. In May 2009, a TASER-funded study reported a

20   cardiac arrest (Greshmond Gray) as consistent with X26 darts to the chest. Charles D.

21   Swerdlow, M.D., et al., "Presenting Rhythm in Sudden Deaths Temporally Proximate to

22   Discharge of TASER Conducted Electrical Weapons," *Society for Academic Emergency*

23   *Medicine*, (May 2009). In June 2009 the Braidwood Commission on TASER use in Vancouver,

24   Canada, after extensive hearings in which TASER participated, along with many others,

25   concluded:

26        •    There is evidence that the electrical current from a conducted energy weapon

27             is capable of triggering ventricular capture.

28        •    Based on animal studies, I am satisfied that the greatest risk of ventricular

-9-
COMPLAINT FOR DAMAGES

fibrillation arises when the probes are vectored across the heart, and that the risk
of ventricular fibrillation increases as the tips of the probes get closer to the wall
of the heart.

• There is a short "window" during the heart's normal beat cycle (the T-wave),
when the heart is most vulnerable to an external electrical shock.  However, this
narrow window does not apply to rapid ventricular capture causing ventricular
tachycardia, which may degenerate into ventricular fibrillation.

• Although there is often a lack of physical evidence on autopsy to determine
whether arrhythmia was the cause of death, if a person dies suddenly and from no
obvious cause after being subjected to a conducted energy weapon, death is almost
certainly due to an arrhythmia.

The risk of ventricular fibrillation increases significantly in several
circumstances—if the subject has cardiovascular disease or in thin subjects who
have a smaller skin-to-heart distance.  The intense pain, coupled with anxiety and
stress, can cause an outpouring of adrenaline that can stimulate the heart and lead
to dangerous arrhythmias.  Skeletal muscle contractions can lead to acidosis,
which affects the electrolyte balance, making the heart more susceptible to
ventricular fibrillation.  Also, an electrical current coinciding with the T-wave
peak may induce fibrillation with a threshold 25 or more times lower than at other
times in the heartbeat cycle.

27.    In addition to the foregoing, tort suits arising from cardiac arrests and wrongful
death were filed or threatened against TASER, some based on the fact that TASER failed to
warn about the risk of cardiac arrest when instructing officers to fire at the chest, created
exposure to liability. More and more customers were being sued for wrongful death and forced
to make large payouts.

28.    Beginning with Training Bulletin 15.0 on September 30, 2009, TASER
"implemented new risk management strategies, including revisions to product warnings and
training." The Bulletin calls "ventricular fibrillation . . . on the normal adult heart . . . unlikely,"

and that "Researchers have concluded that a close distance between the ECD dart and the heart is the primary factor in determining whether an ECD will affect the heart. This risk is judged to be extremely low in field use," and "The risk of an adverse cardiac event related to a TASER ECD discharge is deemed to be extremely low." (In fact there is no scientifically sound data with which to quantify the risk, other than that the risk increases when the X26 current radiates closer to the heart.) The bulletin states that "We have issued a new TASER Targeting Guide," stating that "we have lowered the recommended point of aim from center of mass to lower-center of mass for front shots."

29.     The revised targeting guidelines touched off an uproar in the law enforcement community because TASER had been so adamant over the years that chest shots were cardiac safe, and many of its customers saw the new "targeting guide" as a "CYA" measure that would protect TASER from liability while increasing the customers'. TASER took several steps to mollify its customer base, essentially announcing that the "targeting guide" need not be taken seriously because cardiac arrest is not a measurable risk of chest shots. Some, including OPD, looked to Defendant Lexipol for guidance.

30.     On October 15, 2009, TASER issued a document addressing: "TASER Training Bulletin 15.0 Regarding Medical Research Update and Revised Warnings." The document states: "The recent release of our Training Bulletin should not be interpreted as a significant change in how our products should be used," that the change in the preferred target zone "has less to do with safety and more to do with effective risk management for law enforcement agencies," that were a cardiac arrest to occur "involving a TASER® electronic control device (ECD) discharge to the chest area – plaintiff attorneys will likely file an excessive use of force claim against the law enforcement agency and officer and try to allege that the TASER ECD played a role in the arrest related death by causing ventricular fibrillation (VF), an arrhythmia that can be fatal without intervention," even though "[t]he available research does not support this." In sum, that the reason for the targeting change is "improving risk management" rather than human safety. TASER distributed a video of Rick Guilbault reading the document.

31.     In response to the rhetorical question, "Can I still deploy my TASER ECD into the

-11-

chest," the October 15, 2009 document responds, "Yes." "However, when the situation allows for sufficient time to intentionally aim the ECD and from a best practice standpoint, it is recommended to try, when possible, to aim for the preferred target areas shown in the new training bulletin . . . . While this may require some slight modification to traditional target acquisition by lowering the point of aim several inches to lower center mass, this will play an important role in reducing risk management issues and avoiding litigation."

32.    On October 22, 2009, Rick Smith issued a statement containing assertions such as the following: "As you may have seen, there are sensational stories running in the media regarding a recent training bulletin from TASER International. Unfortunately, the stories in the public media are wildly inconsistent, and do not accurately represent the bulletin, or the rationale behind it."

Media is reporting [sic] that TASER is prohibiting chest shots because of a danger of cardiac arrest.

This is completely incorrect. TASER has RECOMMENDED slightly lowering the PREFERRED point of aim from center of mass to lower center of mass for shots to the front of the body. Aiming lower results in more effective TASER applications, further reduces the risk of accidental shots to the throat or eyes, and avoids the controversy over whether it is possible for the TASER to have an adverse effect on the "one in a million" person with a bad heart who is also high on drugs, etc – an impossible standard to meet, measure, or even quantify.

. . . .

. . . . We have not stated that the TASER causes VF events in this bulletin, only that the refined target zones avoid any potential controversy on this topic.

. . . .

. . . . These recommendations are also intend [sic] to help our agency customers develop the most effective policies and training that are responsive to community concerns about how police officers can most safely respond to violent resistance.

. . . . The recent release of our Training Bulletin should not be interpreted as a

1  significant change in how our products should be used. The recommendations
2  should be viewed as best practices that mitigate risk management issues resulting
3  in more effective deployments while maximizing safety considerations such as
4  avoiding the face, neck, and chest/breast shots.

5      33.    On October 23, 2009, Rick Smith hosted a conference call joined by hundreds of
6  master instructors, trainers, distributors and representatives of customer agencies. The call lasted
7  about two hours.  OPD then-Sergeant (now Lieutenant) John Duffield listened to the call on
8  behalf of the OPD, which wanted to learn what policy changes and additional training would be
9  required following TASER's announced "revised targeting guidelines." Plaintiffs are informed
10 and believe that one or more representatives of Lexipol were also on the call. Although
11 TASER's corporate counsel Doug Klint and Medical Director Jeffrey M. Ho, M.D., spoke
12 during the call, Rick Smith was the dominant voice. Rick Smith repeated many of the same
13 statements in the October 22, 2009, release. He began: "'Are chest hits with the taser
14 dangerous?' and the answer to that is definitively 'No.'" Dr. Ho said "Categorically no,"
15 TASER had not seen instances of ventricular fibrillation from chest shots in field uses. This was
16 deliberately false, as at that time TASER was aware of multiple instances of ventricular
17 fibrillation following chest shots, including, for example, Greshmond Gray in Georgia (2004),
18 Akeem Watson in Illinois (2005), Steven Butler in California (2006), Darryl Turner in North
19 Carolina (2008), Kevin Piskura in Ohio (2008), Derek Jones in Virginia (January 2009), and
20 Kevin Mitchell in Michigan (April 2009). After referring to the data from independent research
21 on animals, Dr. Ho said that the risk of an adverse cardiac event from a chest shot was so small
22 that it could be rounded to zero.

23     34.    Rick Smith told the listeners that agency policies should not be revised to prohibit
24 chest shots, nor should such uses of a taser be classified lethal force. He said that the taser is
25 more effective when shot lower (this is true, and had been trained for at least three years), and
26 aiming lower reduces the risk of head, throat and eye injuries, but the "real and biggest reason
27 here is risk management and eliminating the controversy." Using the hypothetical that TASER
28 has not tested the X26 "on 60-pound persons with a ten-year history of abusing

methamphetamine, who are high on a cocktail of drugs, who've been running from the police and are exhausted" he said "when we start talking about this risk there's been a lot of controversy whether the taser might affect this one in a million person. And there have been pig studies on it. And if you do enough things to an anaesthetized pig you can cause some problems with the taser."

35. Referring to the Braidwood Commission, Rick Smith said that after the report was issued, plaintiffs' lawyers would present death cases to juries who could "go the other way" if there were chest shots and the death was "proximal to the use of the taser." Failure "as a community" to "take this into consideration" could expose "us" to "punitive damages that could be cataclysmic for either that agency or TASER International if the jury's convinced that collectively we've been non-responsive." Rick Smith emphasized however, that there was no real risk from the X26. "If you have to use force on somebody, about one in 600 is going to die," he said, an absolutely absurd statistic that is just as fabricated as TASER's nonsensical claim that their products have saved over 100,000 lives. Rick Smith falsely stated there was "no human data supporting the need to do this." Doug Klint added that the animal studies "do not represent real life field situations but we're stuck with it." Finally, Rick Smith added, "there is no evidence that we've seen, even in pigs, of a drive-stun to the chest" interfering with heart rhythm. That ignores the findings published of a TASER-funded study, "Cardiac Effects of Electrical Stun Guns: Does Position of Barbs Contact Make a Difference?"*Pacing Clin. Electrophysiol.*, Vol. 31, 4/2008: 398-408 at 405.

36. In the foregoing fashion, TASER and Rick Smith maliciously, deliberately, wantonly and negligently failed to alert its customers and users that the risk of an adverse cardiac effect increases dramatically when the darts are vectored across the chest or barbs are located close to the heart, while at the same time giving false assurances of safety, which have led to more incidents of cardiac arrest, including Plaintiff's.

37. Lexipol issued its law enforcement agency customers a recommendation regarding TASER Training Bulletin No. 15, which was relied upon by OPD. This recommendation was as follows:

1   Because chest shots will inevitably occur and are probably unavoidable in many

2   dynamic situations, it remains unclear how this latest Training Bulletin will

3   somehow "enhance an agency's ability to defend litigation." Thus, absent an

4   agency's decision to completely remove ECD's from service, we recommend what

5   we believe are more tailored and practical policy modifications. For example, we

6   will be providing our subscribing agencies with some of the following

7   recommended additions to our already comprehensive ECD policy:

8       1.    While manufacturers [sic] have generally recommended that

9            reasonable efforts should be made to target lower center mass and

10           avoid intentionally targeting the head, neck, groin and chest, it is

11           recognized that the dynamics of each situation and officer safety

12           may not permit the [officer/deputy] to limit the application of the

13           [ECD device] darts to a precise target area. As such, [officers/

14           deputies] should take prompt and ongoing care to monitor the

15           condition of the subject if one or more darts strikes the head, neck,

16           chest or groin. [NOTE: This language will coincide with existing

17           language regarding medical assessment in such situations.]

18   Because of the recent Training Bulletin No. 15, we will also be including

19   additional and ongoing training by the agency to include:

20       2.    Target area considerations, to include techniques or options to

21           reduce the intentional application of probes near the chest, groin,

22           neck and head.

23   Lexipol did not recommend extensive retraining of officers to teach them to avoid the chest, nor

24   to make explicit the fact that chest shots increased the risk of cardiac arrest.

25       38.    OPD, in particular, was left with the impression that TASER and Lexipol were

26   advising the X26 would not cause cardiac arrest if shot in the chest, and that TASER were not

27   recommending the lowering of the target area to lower the risk of cardiac arrest from chest

28   shots. This incident occurred as a result.

## FACTS RELATIVE TO THE DEATH OF TOM SCHROCK

39.     Tom Schrock had a long history of significant mental illness. Nevertheless, he was loved and appreciated by his wife, Nancy, by their two children, Matthew and Sarah. The four of them comprised a tight and loving family unit. Tom was a very thin man. He stood 5'10" but weighed less than 140 pounds. Tom had various physical health problems, including cardiac issues, secondary to his mental illness and concomitant behavior.

40.     Tom required medications to manage his mental illness. As happens with mental illness, from time to time Tom's symptoms increased, even with medication, and he lost control of his cognition and behavior. On these occasions Plaintiffs called 911, and OPD officers responded. On prior occasions, OPD officers took Tom into custody pursuant to Cal. Welf. & Inst. Code § 5150. Tom received emergency hospitalization, psychiatric assessment and treatment, and usually an adjustment to his medications, before returning home to resume his life with Plaintiffs.

41.     During the evening of June 21, 2012, Tom experienced a psychotic episode at the Schrock family home at 1615 North Humboldt Avenue in Ontario, California. He was very agitated and in an altered state of consciousness. Plaintiffs Nancy Schrock and Matthew Schrock were present, as was their family friend, James Buck.  Both Mr. Buck and Nancy called 911 and asked for help.

42.     Initially, OPD Corporal John Lopez, Officer Robert Sturgis and Defendant Officer Santiago Mota responded. The officers knew they were dispatched to assist with section 5150 hold for a mentally-ill family member who was unarmed. The officers assembled in front of the home, near the curb. They heard Tom yelling in the backyard. Officer Sturgis and Corporal Lopez had each been to the home previously, on separate occasions, and had each been involved in Tom's being detained on a section 5150 hold for psychiatric evaluation and treatment.

43.     While the officers walked through the house to the backyard, Officer Mota disengaged the safety on his X26 taser out, activating the video recorder. The following events are documented on the "TASER-cam" video.

44.     As Tom approached the officers he said in a low voice, "Get out of my house."

1  Officer Mota fired darts from his X26 taser at Tom. Apparently only one dart hit, embedding

2  itself on Tom's lower abdomen. The second dart, most likely the lower, appears to have missed

3  entirely.  Tom reacted to the pain of being hit by the one dart, but does not appear to be

4  otherwise disabled by the X26's electrical current.

5        45.    Officer Mota followed Tom, who moved to a walled-in corner of the backyard.

6  Tom turned around, facing the officers. Officer Mota ran up to Tom and applied a "three-point"

7  drive stun to the center of Tom's chest, the area where the probability of cardiac effect is

8  highest. With the electrical circuit completed, the pulsing current traveled directly through

9  Tom's heart, causing deadly ventricular fibrillation.

10        46.    Tom dropped to the ground in full cardiac arrest. His only sounds were agonal

11  moaning. The situation confused the officers, as they had been assured by TASER and Lexipol

12  that cardiac arrest was not in fact a consequence of X26 use. An ambulance was called.

13  Paramedics found Tom in full cardio-pulmonary arrest. Using a heart monitor, the paramedics

14  found Tom's rhythm to be ventricular fibrillation, which is the lethal arrhythmia most likely

15  associated with cardiac arrest from electrical current. The paramedics administered three

16  electrical shocks along with medications.  As a result of the paramedics' efforts they eventually

17  restored Tom's normal heart rhythm.

18        47.    Tom was transported by ambulance to the San Antonio Community Hospital

19  Emergency Room, where he was stabilized and then admitted to the hospital itself.  Because of

20  the length of his cardiac downtime, the lack of blood flow caused too much anoxic brain injury

21  for Tom to survive.

22        48.    Tom ultimately was transferred to Kaiser Permanente Ontario Medical Center, and

23  died there, surrounded by his grieving family, when life support was terminated on June 28,

24  2012.

25                  **FIRST CAUSE OF ACTION**

26                       **(NEGLIGENCE)**

27                **(Against All Defendants)**

28        49.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 48.

50.     At all times relevant to the Complaint, Defendants, and each of them, were engaged in the business and profession of designing, manufacturing, selling, distributing, installing, fabricating, assembling, buying, inspecting, testing, servicing, repairing, marketing, advertising warranting, instructing, and warning about the use of the Model X26, along with providing training for its customers to use during training of officers.  Defendants held themselves out as having special expertise in the industry.  As such, Defendants owed Plaintiffs a duty to use reasonable care in the design, manufacture, sale, distribution, marketing, advertising, instructing and/or warnings about the use of the Model X26.

51.     At all times herein mentioned, Defendants negligently violated their duties of care by supplying the Model X26 and not giving adequate instructions and warnings about the use of the Model X26.  Defendants  negligently and carelessly designed, manufactured, sold, distributed, installed, fabricated, assembled, bought, inspected, altered, maintained, serviced, tested, repaired, marketed, warranted, instructed, and advertised their unreasonably dangerous defective product in that Defendants knew or should have known that the device was capable of causing, and did in fact cause, personal injuries and death to persons while being used in a manner reasonably foreseeable, including Tom Schrock, thereby rendering the product unsafe and dangerous for its intended use.

52.     The dangers and defects that existed in the Model X26 were reasonably foreseeable, known and/or knowable, and discoverable at the time of the incident.

53.     Defendants deliberately chose not to timely and reasonably revise its training protocol and materials to instruct instructors and users to avoid shots to the chest because of the increased risk of cardiac arrest for its own marketing reasons, and failed to warn of material facts regarding the safety and efficacy of the Model X26, including that shots to the chest, near the heart, increase the risk of cardiac arrest. Had Defendants done so, proper training could have been given and proper warnings could have been heeded.

54.     Defendants failed to timely and reasonably provide adequate instructions and training concerning safe and effective use of the Model X26. Had Defendants done so, law enforcement professionals, including the OPD officers, would have more safely deployed the

-18-
COMPLAINT FOR DAMAGES

1  X26.

2      55.    The conduct of Defendants, and each of them, was the legal cause of Tom

3  Schrock's death, as described above, and Plaintiffs suffered economic losses and non-economic

4  damages in an amount to be awarded according to proof.

5      56.    As a legal result of Defendants' acts and omissions as heretofore described, Tom

6  Schrock suffered serious injuries and incurred medical bills for health care services necessary to

7  try and save his life until he died.

8      57.    Defendants TASER, Rick Smith and DOES 1 to 50 acted in a despicable,

9  malicious, oppressive and fraudulent manner, in conscious disregard of the rights and safety of

10  the Decedent, and others on whom the X26 might be used, such that Plaintiff Nancy Schrock in

11  her capacity as the successor in interest to Thomas Schrock, deceased, is entitled to exemplary

12  and punitive damages in amounts to be awarded at trial.

13                    **SECOND CAUSE OF ACTION**

14                    **(STRICT PRODUCT LIABILITY)**

15          **(Against Defendants TASER, RICK SMITH and DOES 1-50)**

16      58.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 57.

17      59.    At all times relevant to the Complaint, Defendants, and each of them, designed,

18  manufactured, sold, distributed, installed, fabricated, assembled, bought, inspected, tested,

19  serviced, marketed, warranted, advertised, instructed, trained and warned about the use of the

20  Model X26, for use in California and elsewhere throughout the United States, with the

21  knowledge that it would be used by consumers without inspection for defects.

22      60.    The Model X26 was capable of causing and in fact did cause serious personal

23  injuries and death to persons like Tom Schrock when the Model X26 was used in a reasonably

24  foreseeable manner, and therefore was defective and unreasonably dangerous for its intended

25  purpose. Defendants' product was unreasonably dangerous because, among other things, it was

26  defectively designed, manufactured, marketed, sold and distributed without adequate warnings

27  of the risks and dangers as alleged above, in this Complaint.

28

61.    The conduct of Defendants, and each of them, was the legal cause of Tom Schrock's death, as described above, and Plaintiffs suffered economic losses and non-economic damages in an amount to be awarded according to proof.

62.    As a legal result of Defendants' acts and omissions as heretofore described, Tom Schrock suffered serious injuries and incurred medical bills for health care services necessary to try and save his life until he died.

63.    Defendants TASER, RICK SMITH and DOES 1 to 50 acted in a despicable, malicious, oppressive and fraudulent manner, in conscious disregard of the rights and safety of the Decedent, and others on whom the X26 might be used, such that Plaintiff Nancy Schrock in her capacity as the successor in interest to Thomas Schrock, deceased, is entitled to exemplary and punitive damages under a survival claim in amounts to be awarded at trial.

**THIRD CAUSE OF ACTION**

**(INTENTIONAL MISREPRESENTATION)**

**(Against Defendants TASER, RICK SMITH and DOES 1-50)**

64.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 63.

65.    Defendants represented to the OPD all of the material statements of fact set for herein above.

66.    These representations were in fact false.  Defendants knew that the misrepresentations were false when they were made, and/or made them recklessly and without regard for their truth.

67.    Defendants intended that law enforcement agencies such as the OPD rely on the misrepresentation, and in fact, the OPD and its trainers did rely on these misrepresentations in purchasing, deploying, training, instructing, and otherwise using TASER manufactured X26s as a law enforcement tool in interacting with members of the public such as the Decedent.

68.    As a legal result of Defendants' misrepresentations, Tom Schrock incurred medical bills and died and Plaintiffs suffered economic and non-economic damages as described above.

1    69.    Defendants TASER's, Rick Smith's and Does' intentional misrepresentations
2  were malicious, oppressive and fraudulent, and constituted despicable conduct entitling Plaintiff
3  Nancy Schrock as the successor in interest to Thomas Schrock, deceased, to awards of
4  exemplary and punitive damages under a survival claim in amounts to be awarded according to
5  proof.

6                        **FOURTH CAUSE OF ACTION**
7                (**FRAUDULENT CONCEALMENT AND DECEIT**)
8          (**Against Defendants TASER, RICK SMITH and DOES 1- 50**)

9    70.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 69.
10    71.    Defendants intentionally failed to disclose to the OPD and other law enforcement
11  agencies material and important facts that were known to Defendants TASER and Rick Smith,
12  and could not be expected to have been discovered by the OPD and other law enforcement
13  agencies, all as described hereinabove.  These important and material facts include, but are not
14  limited to: that the X26 has caused ventricular fibrillation, cardiac arrest, hypoxic brain injury
15  and death; that the risk of ventricular fibrillation and cardiac arrest is significantly decreased if a
16  person is shocked with the X26 other than in the front of the chest; that to reduce the risk of
17  brain injury or death from cardiac arrest by an X26, law enforcement officers who deploy X26s
18  should aim away from the heart and should minimize the duration of exposure.

19    72.    Furthermore, Defendants actively concealed these important material facts from
20  the OPD and other law enforcement agencies, and/or prevented such agencies from discovering
21  these facts.  Instead, Defendants disclosed partial truths about the X26 but intentionally failed to
22  disclose the important and material facts set forth above.

23    73.    At all times herein mentioned, the OPD relied upon Defendants for appropriate
24  warnings, instructions, and an objective account of the medical and scientific evidence so that
25  officers of the OPD could be properly trained and instructed in the safest possible use of the
26  X26.

27    74.    The OPD and other law enforcement agencies did not know of the facts concealed
28  by Defendants TASER, Rick Smith and DOES 1-50.

-21-
COMPLAINT FOR DAMAGES

75. Defendants TASER, Rick Smith and DOES 1-50 intended to deceive the OPD, other law enforcement agencies, and the general public, of the true facts. The OPD and other law enforcement agencies reasonably relied on Defendants' deceptions.

76. As a legal result of Defendants' concealments, Tom Schrock incurred medical bills and died and Plaintiffs suffered economic and non-economic damages in an amount to be awarded according to proof.

77. Defendants TASER, RICK SMITH and DOES 1-50 acted in a despicable, malicious, oppressive and fraudulent manner, in conscious disregard of the rights and safety of the Decedent, and others on whom the X26 might be used, such that Plaintiff Nancy Schrock in her capacity as the successor in interest to Thomas Schrock, deceased, is entitled to exemplary and punitive damages under a survival claim in amounts to be awarded at trial.

## FIFTH CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)
### (Against All Defendants)

78. Plaintiffs incorporate by reference the allegations of paragraphs 1 through 77.

79. Defendants TASER, RICK SMITH, LEXIPOL and DOES 1-100 represented to the OPD and other law enforcement agencies important and material facts described hereinabove.

80. These important material facts and representations were not true, and Defendants had no reasonable grounds for believing that these representations were true when they were made.

81. Defendants intended that the OPD, as well as other law enforcement agencies and members of the general public, rely on these representations, and these individuals did in fact reasonably rely on the misrepresentation.

82. As a legal result of Defendants' misrepresentations, Tom Schrock incurred medical bills and died, and Plaintiffs suffered economic and non-economic damages in an amount to be awarded according to proof.

-22-
COMPLAINT FOR DAMAGES

**PRAYER**

WHEREFORE Plaintiffs pray for judgment against Defendants, and each of them, as follows:

    1.    For economic and non-economic damages in an amount to be awarded according to proof;

    2.    For prejudgment interest according to law;

    3.    For costs of suit; and

    4.    For such other and further relief as the Court deems just and proper.

And for judgment against Defendants TASER, Rick Smith and DOES 1-50:

    5.    For punitive and exemplary damages against those Defendants in amounts to be awarded according to proof;

Dated: June ___, 2014

                             **MARDIROSSIAN & ASSOCIATES, INC.**
                             **THE LAW OFFICES OF JOHN BURTON**

                   By: _____

                     Rowena J. Dizon, Esq.
                     Attorneys for Plaintiffs  NANCY SCHROCK,
                     MATTHEW SCHROCK, SARAH PALMER

# EXHIBIT B

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Caro Mardirossian, Esq.     SBN : **101812**<br>MARDIROSSIAN & ASSOCIATES, INC.<br>6311 Wilshire Blvd. 3rd Fl.<br>Los Angeles, CA, 90048<br>TELEPHONE NO: **(323) 653-6311** | F I L E D<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN BERNARDINO<br>SAN BERNARDINO DISTRICT<br><br>**SEP 25 2014**<br><br>BY _Sugey Quintero_<br>SUGEY QUINTERO, DEPUTY |

E-MAIL ADDRESS (Optional):

ATTORNEY FOR (Name): **Plaintiff(s)**       **PP6311-4**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO**
STREET ADDRESS: **247 W. Third St**
MAILING ADDRESS:
CITY AND ZIP CODE: **San Bernardino, 92415**
BRANCH NAME: **San Bernardino District Civil**

| PLAINTIFF/PETITIONER:   **Nancy Schrock, et al** | CASE NUMBER:<br>**CIVDS1408556** |
|---|---|
| DEFENDANT/RESPONDENT:   **Taser International, Inc., et al** | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:     Dept.:<br>**X79164** |

*(Seperate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of
   a. [✓] summons
   b. [✓] complaint
   c. [✓] Alternative Dispute Resolution (ADR) package
   d. [✓] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [✓] other *(specify documents):*  **Certificate of Assignment,NTC of Trial Setting Conference and NTC of Case Assignment**

3. a. Party served *(specify name of party as shown on documents served):*
      **Taser International, Inc.**

   b. [✓] Person (other than the party in item3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      **Bjorn Flor(Agent for Service of Process)**

4. Address where the party was served:
      **818 West Seventh St, 2nd Fl, Los Angeles, CA, 90017**

5. I served the party *(check proper box)*
   a. [✓] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date):* **9/19/2014**      (2) at *(time):* **12:30 PM**
   b. [ ] **by substitute service.** On *(date):*            at *(time):*          I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ]  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ]  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ]  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post box. I informed him or her of the general nature of the papers.

      (4) [ ]  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*          from *(city):*          or [ ] a declaration of mailing is attached.

      (5) [ ]  I attached a **declaration of diligence** stating actions taken first to attempt person service.

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>American LegalNet, Inc.<br>www.FormsWorkflow.com |
|---|---|---|

| PLAINTIFF/PETITIONER: **Nancy Schrock, et al** | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: **Taser International, Inc., et al** | **CIVDS1408556** |

5.   c. ☐   **by mail and aknowledgment of receipt of service.** I mailed the documents listed in item2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                        (2) from *(city):*

    (3) ☐   with two copies of the *Notice and Acknowledgement of Receipt* and a postage-paid return envelope addressed to me   *(Attach completed  Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) ☐   to an address outside California with return receipt requested.  Code Civ. Proc., § 415.40

   d. ☐   **by other means** *(specify means of service and authorizing code section):*

            ☐   Additional page describing service is attached

6.   The "Notice to the Person Served" (on the summons) was completed as follows:

   a. ☐   as an individual

   b. ☐   as a person sued under the fictious name *(specify):*

   c. ☐   as occupant

   d. ☑   On behalf of *(specify):*  **Taser International, Inc.**

        under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unkown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7.   **Person who served papers**

   a.   Name:   **Armen Shekherdemian**

   b.   Address: **3436 Foothill Blvd. #144, Glendale, CA, 91214**

   c.   Telephone number:  **(818) 951-7116**

   d.   **The fee** for service was: **$42.00**

   e.   I am:

     (1) ☐   not a registered California process server.

     (2) ☐   exempt from registration under Business and Professions Code section 22350(b).

     (3) ☑   a registered California process server:

        (i) ☐ owner  ☐ employee  ☑ independent contractor.

        (ii)  Registration No.: **2014198025**

        (iii)  County:. **Los Angeles**

8.   ☑   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     or

9.   ☐   I am a California sheriff or marshal an   I certify that the foregoing is true and correct.

Date: **9 /23/2014**

**Armen Shekherdemian**
_____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)               (SIGNATURE)

**PROOF OF SERVICE**

I, Kathryn M. Craig, declare:

I am a citizen of the United States and employed in Orange County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 4695 MacArthur Court, Suite 350, Newport Beach, California 92660-8816. On October 17, 2014, I served a copy of the within document(s):

**DECLARATION OF ELIZABETH V. MCNULTY IN SUPPORT OF NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441(b) (DIVERSITY)**

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Newport Beach, California addressed as set forth below.

☐    by placing the document(s) listed above in a sealed Federal Express envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Federal Express agent for delivery.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐    by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

| | |
|---|---|
| Gary Mardirossian, Esq. | John Burton, Esq. |
| Rowena J. Dizon, Esq. | THE LAW OFFICES OF JOHN |
| MARDIROSSIAN & ASSOCIATES, | BURTON |
| INC. | 4 East Holly Street, Suite 201 |
| A Professional Law Corporation | Pasadena, CA 91103 |
| 6311 Wilshire Boulevard | Phone: (626) 449-8300 |
| Los Angeles, CA 90048-5001 | Fax: (626) 449-4417 |
| Phone: (323) 653-6311 | |
| Fax: (323) 651-5511 | *Attorneys for Plaintiffs* |

*Attorneys for Plaintiffs*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on

T0211001/1925858-1

1   motion of the party served, service is presumed invalid if postal cancellation date or postage

2   meter date is more than one day after date of deposit for mailing in affidavit.

3          I declare that I am employed in the office of a member of the bar of this court at whose

4   direction the service was made.

5          Executed on October 17, 2014, at Newport Beach, California.

6

7                                                    _Kathryn M Craig_

8                                                    Kathryn M. Craig

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28